GARY CARTWRIGHT *et al.*, Plaintiffs-Appellees and Cross-Appellants, v. GOODYEAR TIRE AND RUBBER COMPANY, Defendant-Appellant and Cross-Appellee.

First District (6th Division)    Nos. 1—94—0700, 1—94—0938 cons.

Opinion filed April 12, 1996.—Rehearing denied May 24, 1996.

Burke, Weaver & Prell, of Chicago (Nicholas J. Bua, Edmund W. Sinnott, Michael H. West, and Charles D. Knight, of counsel), for appellant.

Jeffrey M. Goldberg & Associates and William J. Harte, Ltd., both of Chicago (Jeffrey M. Goldberg, James M. Geraghty, William J. Harte, and Joan M. Mannix, of counsel), for appellees.

PRESIDING JUSTICE ZWICK delivered the opinion of the court:
Plaintiff Gary Cartwright instituted this action seeking recovery

for personal injuries allegedly caused by a defective truck tire manufactured by defendant Goodyear Tire & Rubber Company. Plaintiff Laura Cartwright sought recovery for loss of consortium as a result of the injuries suffered by her husband. The claims were tried before a jury which returned a verdict of $9,040,000 in favor of Gary Cartwright and a verdict of $2 million in favor of Laura Cartwright. Defendant filed a post-trial motion requesting a new trial or, in the alternative, a remittitur of both judgments. While this motion was pending, defendant brought a petition to vacate the judgments pursuant to section 2—1401 of the Code of Civil Procedure (735 ILCS 5/2—1401 (West 1994)). Upon motion of the plaintiffs, the trial court dismissed defendant's petition and denied its request for leave to file an amended petition. The court granted a remittitur as to both judgments as requested in defendant's post-trial motion, finding that evidence relating to plaintiff's military service improperly appealed to the passions and sympathies of the jury and resulted in verdicts which were grossly excessive.

Defendant now appeals, asserting that the trial court abused its discretion in dismissing without a hearing the section 2—1401 petition to set aside the judgments in favor of plaintiffs. Defendant also appeals the denial of its post-trial motion, and plaintiffs have filed a cross-appeal challenging the trial court's grant of a remittitur as to each judgment.

The record reveals that on April 11, 1986, plaintiff Gary Cartwright was employed as a truck driver for Mid-American Growers. At approximately 8:30 a.m., as Cartwright was driving his delivery truck along interstate highway I-74 between Bloomington and Champaign, Illinois, the truck left the roadway, straddled a guardrail for approximately 120 feet, and then collided with a bridge abutment. After the accident, both of the truck's front tires were flat. Cartwright suffered multiple fractures in the accident which required several surgeries during the following three years. As a result of the injuries sustained in the accident, Cartwright was physically impaired and suffered intense pain.

Cartwright brought a product liability action against defendant, the manufacturer of the right front tire on his truck, claiming that a manufacturing defect in the tire resulted in a blowout which caused the accident. Cartwright alleged that this manufacturing defect rendered the tire unreasonably dangerous at the time it left defendant's control and that the defect was the proximate cause of the accident.

The parties engaged in pretrial discovery, during which Cartwright answered an interrogatory requesting information regarding

his employment history at the time of the accident and during the preceding 10 years. Cartwright's sworn answer to this interrogatory consisted of 24 individual entries describing his previous employment. The final entry in this answer related to Cartwright's military service and stated that he had served in the military from April 1973 to June 1976 as a Ranger, earning $500 per month.

At trial, plaintiff Gary Cartwright testified that on the morning of the accident, he was traveling eastbound on interstate highway I-74 toward Champaign, Illinois. Cartwright had both hands on the wheel and his window down when he heard a loud bang and the right front corner of his truck dropped down, pulling hard to the right. His truck then left the roadway, went up onto the guardrail, rode the guardrail up to the bridge abutment and hit it. Cartwright testified that the guardrail was straight and ran alongside the edge of the shoulder of the road.

Shortly before Gary Cartwright took the stand to testify, his attorney tendered to defense counsel a letter which purported to be written by an unidentified lieutenant general at a Fort Morris, Maryland. The letter ostensibly detailed certain highlights of Cartwright's military service approximately 12 years before the accident. Plaintiffs' counsel sought to have the letter admitted, but defense counsel's objection was sustained.

Although the letter was not admitted into evidence, Cartwright was permitted to testify as to its contents. Accordingly, Cartwright testified that he had served in Vietnam and was awarded the Silver Star, Bronze Star with two Oak Leaves, the Purple Heart with an Oak Leaf Cluster, the Army Commendation Medal, the South Vietnam Service Medal, the South Vietnam Medal of Honor, the National Defense Medal and 11 letters of commendation. According to Cartwright, he was also offered both the Distinguished Service Cross and the Medal of Honor, but refused to accept either award because he was only doing his duty as a soldier.

Cartwright testified that these honors were bestowed upon him, in part, as a result of his conduct under fire in Vietnam on July 29, 1974. Cartwright explained that he exposed himself to enemy fire several times that day in order to rescue wounded personnel, and, in fact, received two wounds himself. He further stated that one of the wounded persons that he had rescued was a high-ranking officer. To effect the rescue, Cartwright killed four enemy personnel in hand-to-hand combat and then carried the wounded officer to safety. Cartwright then led his men in an attack on the enemy position. During this action, Cartwright personally destroyed three bunkers and two mortar teams, killing at least 30 of the enemy. Notwithstanding his

wounds, Cartwright refused any medical treatment until his men had been cared for.

Gary Cartwright also testified as to the ways in which his life had changed as a result of the accident. He stated that prior to the accident, he was an active man who enjoyed hunting, fishing and working on models. Since the accident, he has experienced severe pain and is sometimes barely able to get out of bed. He has been unable to hunt, cannot play with his sons, and is not employable. Cartwright also testified that his relationship with his wife was greatly affected by the accident because he has become impotent. He stated that they no longer sleep in the same bed because it causes him pain when she moves in bed and touches his body. Cartwright also stated that he has lost control of his bladder and bowels and suffers great embarrassment as a result.

In addition, Cartwright testified that he has certain mental problems such as forgetfulness, depression and anger. He shouts at his wife and children and has pushed them away. Cartwright stated that he relies on daily pain medication, and he read for the jury certain entries in a journal that he kept after the accident. These journal entries described his pain, depression, despair, including thoughts of suicide. Cartwright testified further that, at the time of trial, his medical expenses were $136,646.55.

Kenneth Halliburton testified for the plaintiffs that prior to the accident he had been operating his truck 400 to 500 feet behind Cartwright's vehicle. He described Cartwright's driving as straight down the road. Cartwright was not swerving, and there was no indication that Cartwright had fallen asleep at the wheel. Halliburton described the accident as if Cartwright might be aiming to pull over, but then his truck "jumped off" the road. Immediately after the accident, Halliburton pulled over, stopped his truck and went to assist Cartwright.

Halliburton did not recall whether there was a guardrail present. He stated further that what he saw of Cartwright's accident was consistent with the handling of trucks with front tire blowouts. Halliburton acknowledged, however, that he did not know what caused Cartwright's truck to leave the roadway, and he did not see a blowout of the right front tire of Cartwright's truck. Halliburton also stated that he did not hear any noise, did not see any smoke coming from the right side of the truck and did not observe any skid marks or tire debris at or near the scene of the accident. In addition, he did not see any brake lights on Cartwright's truck immediately before the accident occurred.

Illinois State Trooper Edward Buescher testified that he arrived at the accident scene approximately 10 to 15 minutes after the occur-

rence. Buescher observed that the 120-foot-long guardrail was damaged throughout its entire length. The front end of Cartwright's truck had straddled it and was raised up and carried along the guardrail. Buescher stated that he found no tire debris or skid marks at the scene, but acknowledged that the absence of tire debris did not indicate whether there had been a tire failure. Buescher testified that he had no recollection of Cartwright telling him how the accident happened.

Rex Miller, called by plaintiffs as their tire expert, testified in substance that the failure of the subject tire resulted from a separation which was caused by a manufacturing defect. Miller acknowledged, however, that he could not identify the specific cause of the separation defect in the tire.

Pursuant to section 2—1102 of the Code of Civil Procedure (735 ILCS 5/2—1102 (West 1994)), plaintiffs called Charles Yurkovich, a tire expert, who testified that separation defects could be caused by a number of different things, including under-inflation, overloading, or post-manufacture contamination with moisture or other foreign material. Upon examination of the subject tire, Yurkovich concluded that it was damaged by a sharp impact, not a separation blow out. In Yurkovich's opinion, the tire did not fail as a result of a manufacturing defect.

Cartwright presented evidence of his damages through the testimony of John Wright, M.D., James Young, M.D., Timothy Urbin, Ph.D., and Charles Linke, Ph.D., who testified as to Cartwright's personal injuries as well as his past and future medical expenses. The testimony of these witnesses detailed the severe physical injuries suffered by Cartwright and stated that Cartwright was permanently disabled from working in the future.

Plaintiff Laura Cartwright testified that prior to the accident, she and her husband loved each other and had a happy life with their two sons. They enjoyed picnics, fishing, playing frisbee and other family outings. However, after the accident, Cartwright was unable to engage in any of these activities. Laura Cartwright stated that her husband has become very depressed and has expressed a desire to commit suicide. She testified further that prior to the accident, she and her husband had a very normal sex life. Since the accident, however, they have not had sex and do not sleep in the same bed because she causes him pain if she touches him. Laura Cartwright also stated that she and her husband no longer do much together because he does not want to be around people anymore. In addition to being the sole financial support for the family, Laura Cartwright takes care of the house and of their two children. Gary Cartwright

cannot do any chores or help around the house, and Laura anticipates that within 5 to 10 years, she will be taking care of him while he is in a wheelchair.

Defendant called Don Avila as one of its expert witnesses. Avila testified that there was no separation defect in this tire. In Avila's opinion, the tire was fully inflated at the time of impact with the bridge abutment, and it was that impact which tore the tire apart.

Defendant also called Chester Patterson as an expert witness. Patterson corroborated the opinion of Avila, testifying that the subject tire was destroyed on impact with the bridge abutment and was fully inflated at the time of impact. According to Patterson, there was no defect in the tire prior to impact.

Plaintiffs' counsel referred to Cartwright's military heroism during his opening statement, stating that Cartwright had risked his life to save fellow soldiers and later turned down the Medal of Honor that the government offered him. During closing argument, counsel recounted the tale of Cartwright's valor under fire. Counsel also reminded the jury that Cartwright had turned down the Medal of Honor and that "there [were] several people we know that are alive today because of who he is."

The jury returned verdicts in favor of both plaintiffs, awarding Gary Cartwright $9,040,000 on his personal injury claim, and Laura Cartwright $2 million on her loss of consortium claim. Defendant timely filed a post-trial motion, asserting that the judgment was against the manifest weight of the evidence and that it had been deprived of a fair trial due to several evidentiary rulings. Defendant requested a new trial or, in the alternative, a substantial remittitur of the damages awarded.

While its post-trial motion was pending, but more than 30 days after judgment was entered on the jury's verdicts, defendant filed a petition to set aside the judgments pursuant to section 2—1401. In this petition, defendant alleged that it had discovered evidence indicating that the letter which purported to document Cartwright's military heroism was a fake and that all of Cartwright's claims of valor were false. Defendant asserted that it learned that there was no Fort Morris, Maryland, and that Cartwright never served in Vietnam or anywhere else outside the United States while in the military. Defendant asserted that it had received evidence that Cartwright had never received any military awards for valor, bravery or heroism, and was never offered the Distinguished Service Cross or the Medal of Honor; that Cartwright never received any wounds as a result of action with enemy forces while in military service and was not awarded the Purple Heart; that on July 29, 1974, the date on

which he allegedly engaged in his acts of Vietnam valor, Cartwright was serving as a clerk-typist at Fort Bragg, North Carolina.

Defendant also asserted that publicity concerning the enormous verdicts in favor of the plaintiffs persuaded Thomas and Cheri Searle, from plaintiffs' hometown of Princeton, Illinois, to come forward for the first time with evidence that, prior to filing suit, plaintiffs claimed that the accident occurred because Cartwright had reached down to pick up some papers that had fallen on the floor of his truck.

Defendant's petition alleged further that prior to trial it did not know and had no reason to suspect, that plaintiffs would offer false evidence that Cartwright had served in Vietnam, that he would make false claims of heroic actions or would boast of turning down the nation's highest military awards. The petition asserted that defendant's counsel first saw the forged letter, which purported to detail Cartwright's alleged military valor, shortly before Cartwright took the stand to testify at trial. According to the petition, defense counsel had no knowledge of United States Army award and commendation procedures at that time and relied upon the representations of plaintiffs and their counsel that the letter and Cartwright's sworn testimony based thereon were true.

Plaintiffs moved to dismiss defendant's section 2—1401 petition, contending that, as a matter of law, the testimony alleged to have been perjured, regarding Cartwright's heroic military service, could not have had any effect on the jury's liability finding. Plaintiffs' motion also claimed that defendant had failed to allege facts demonstrating that it exercised due diligence in discovering the allegedly false statements by Cartwright. The trial court granted plaintiffs' motion and dismissed the petition, finding that the testimony as to Cartwright's military service was irrelevant and immaterial and that the members of the jury had been instructed that neither sympathy nor prejudice should influence their verdict. The court also determined that defendant had failed to demonstrate due diligence in investigating Cartwright's military claims presented at trial. The court denied defendant's request for leave to file an amended petition.

The court also denied defendant's request for a new trial on the grounds presented in its post-trial motion, but granted a remittitur based on the testimony regarding Cartwright's purported heroism which resulted in a grossly excessive verdict based on passion and sympathy. The court accordingly ordered a new trial unless plaintiffs agreed to a reduction of Gary Cartwright's injury claim to $5,040,000 and Laura's loss of consortium claim to $1 million. Plaintiffs ultimately consented to the remittitur, and these appeals followed.

On appeal, defendant initially contends that the trial court abused its discretion in dismissing its section 2—1401 petition to set aside the judgments in favor of plaintiffs.

■ Section 2—1401 of the Code of Civil Procedure provides a comprehensive statutory procedure by which final orders, judgments, and decrees may be vacated after 30 days from the entry thereof. 735 ILCS 5/2—1401(a) (West 1992). To be entitled to relief under section 2—1401, the party seeking relief must show by a preponderance of the evidence that (1) a meritorious claim or defense exists; (2) the petitioner exercised due diligence in discovering the defense or claim in the original action; (3) despite such diligence and through no fault on the part of petitioner, the error of fact or valid claim or defense was not made apparent to the trial court at the time of the original action; and (4) petitioner exercised due diligence in the 2—1401 petition. *Smith v. Airoom, Inc.*, 114 Ill. 2d 209, 220-21, 499 N.E.2d 1381 (1986). Section 2—1401 does not afford a remedy to relieve a litigant of the consequences of his own mistakes or his counsel's negligence. See *Cooper v. United Development Co.*, 122 Ill. App. 3d 850, 856, 462 N.E.2d 629 (1984).

The purpose of a petition under section 2—1401 is to bring before the court matters of fact not appearing in the record, which if known to the court at the time the judgment was entered, would have prevented its rendition. *Glenn v. People*, 9 Ill. 2d 335, 340, 137 N.E.2d 336 (1956); *In re Marriage of Tzoumas*, 187 Ill. App. 3d 723, 728-29, 543 N.E.2d 1093 (1989); *Manning v. Meier*, 114 Ill. App. 3d 835, 837-38, 449 N.E.2d 560 (1983).

Plaintiffs brought a motion to dismiss under section 2—615 of the Illinois Code of Civil Procedure (735 ILCS 5/2—615 (West 1994)), asserting that the petition was legally insufficient. Such a motion does not challenge the factual sufficiency of a petition for relief under section 2—1401. *In re Marriage of Reines*, 184 Ill. App. 3d 392, 404, 540 N.E.2d 394 (1989). Thus, the motion admits all well-pled facts and attacks only the legal sufficiency of the petition. *Ostendorf v. International Harvester Co.*, 89 Ill. 2d 273, 279-80, 433 N.E.2d 253 (1982); *Elfman v. Evanston Bus Co.*, 27 Ill. 2d 609, 610, 190 N.E.2d 348 (1963); *Koffski v. Village of North Barrington*, 241 Ill. App. 3d 479, 485, 609 N.E.2d 364 (1993); *Manning*, 114 Ill. App. 3d at 839.

In determining the reasonableness of the excuse offered by the petitioner, all of the circumstances attendant upon the entry of the judgment must be considered, including the conduct of the litigants and their attorneys. *Airoom*, 114 Ill. 2d at 222-23. A section 2—1401 petition invokes the equitable powers of the court as justice and fairness require and should be considered in light of equitable principles.

*Airoom*, 114 Ill. 2d at 225; *Manning*, 114 Ill. App. 3d at 838. Whether a petition to vacate should be granted depends upon the facts and equities presented. *Beno v. DeBoer Asphalt Paving Co.*, 114 Ill. App. 3d 871, 874, 449 N.E.2d 1021, 1023 (1983). Relief is granted under this section in order to achieve justice, and a liberal construction is used to achieve that end. *Beno*, 114 Ill. App. 3d at 874.

Because we are called upon to review the trial court's dismissal of the section 2—1401 petition, we must assume the truth of the uncontradicted factual allegations contained in the section 2—1401 petition. *Ostendorf*, 89 Ill. 2d at 280; *Elfman*, 27 Ill. 2d at 610.

■ The trial court's dismissal of defendant's section 2—1401 petition without an evidentiary hearing was predicated upon the court's determination that (1) the evidence of Cartwright's military heroism was irrelevant and immaterial, (2) the jury had been instructed that neither sympathy nor prejudice should influence its verdict, and (3) defendant failed to allege sufficient facts to demonstrate its due diligence in investigating Cartwright's military service or in discovering witnesses who might have knowledge relating to the cause of the accident. We hold that dismissal of the section 2—1401 petition was improper.

Examination of the record establishes that the credibility of plaintiff Gary Cartwright was an essential element of his claim for personal injuries and was critical to the establishment of liability. Only Cartwright and Halliburton testified as occurrence witnesses, and Halliburton admitted that he could not see whether the right front tire of Cartwright's truck blew out prior to impact. In addition, Halliburton acknowledged that he did not hear any noise which might have accompanied a blowout of the tire. Thus, Gary Cartwright was the only person who could tell the jury what had happened immediately prior to the accident.

Plaintiffs' expert testimony regarding a defect in the tire and the causation of the accident was directly contradicted by the evidence introduced by defendant. Indeed, in ruling on the defendant's motion for a new trial, the trial court specifically stated that the expert testimony regarding the tire was "in conflict." The court went on to state that "it was for the jury as the fact finder to determine the credibility of the witnesses and the weight to be given *** their testimony and what was more probably true than not true as to the facts." In light of these comments, it is clear that Cartwright's testimony regarding the tire blowout was crucial relative to liability. In addition, the credibility of Cartwright's testimony as to his pain and suffering was an integral part of his case on the issue of damages. Contrary to the conclusion of the trial court, the evidence of

Cartwright's military heroism cannot be characterized as immaterial and irrelevant where the credibility of Cartwright's testimony was of paramount importance.

In addition, we disagree that defendant's petition failed to assert sufficient facts to demonstrate that it had exercised due diligence in investigating Cartwright's military record. The petition and supporting affidavits affirmatively stated that as a result of plaintiffs' responses during pretrial discovery, defendant was aware only that Cartwright had served in the military from April 1973 through June 1976. Prior to trial, defendant did not know and had no reason to suspect that plaintiffs would claim Cartwright had served in Vietnam, that he had engaged in combat, or that he had been highly decorated. Defendant first learned of the letter which purported to document Cartwright's military valor shortly before Cartwright took the witness stand. Counsel for defendant assumed the document to be genuine and only began to doubt its authenticity after receiving additional information on October 18, 1993, approximately six weeks after the judgments were entered. The following day, counsel contacted officials in the United States Army in an attempt to verify the contents of the letter presented at trial. Counsel subsequently received a letter from Major Michael J. Wawrzyniak which stated that the letter was a fraud. On November 5, 1993, in response to a subpoena issued by the trial court, defendant's counsel received a certified copy of Cartwright's military records. Defendant filed its section 2—1401 petition within four days of its receipt of those records.

We hold that these allegations were adequate to meet defendant's burden of due diligence, especially where defendant found itself obligated to investigate and verify allegedly false evidence of which defendant had no prior notice and which appeared to have been manufactured by plaintiffs.

Moreover, plaintiffs' assertion that defendant failed to exercise due diligence in investigating Cartwright's military record does not ring true where plaintiffs' attorney had the same opportunity to conduct such an investigation. Plaintiffs and their counsel were aware of and had access to the letter which purported to document Cartwright's military valor long before defendant learned of the letter's existence. However, it appears that no attempt was made to verify or authenticate the letter.

At oral argument before this court, plaintiffs' attorney theorized that any records relating to Cartwright's service in counterintelligence units would have been maintained in a confidential file which was not open to scrutiny by counsel. If that is correct, the defendant would have been unable to examine these sealed records.

Thus, even the most diligent pretrial discovery efforts by defendant would not have uncovered the evidence introduced by plaintiffs at trial. Consequently, we reject plaintiffs' assertion and hold that the trial court erred in dismissing the petition to vacate on the ground that defendant failed to exercise due diligence in its investigation of Cartwright's military service.

Section 2—1401 invokes the equitable powers of the court to avoid an unjust result. Clearly, if Cartwright was capable of fabricating a false war record while under oath, then his credibility on all matters is a proper subject of inquiry.

" 'Perjury is the mortal enemy of justice.' " *People v. Griffin*, 148 Ill. 2d 45, 66, 592 N.E.2d 930 (1992) (Bilandic, J., concurring in part & dissenting in part), quoting *People v. Shannon*, 28 Ill. App. 3d 873, 878, 329 N.E.2d 399 (1975). The interests of justice demand that where a 2—1401 petition alleges that testimony critical to the jury's deliberations was false, an evidentiary hearing must be held.

Because the allegations of false testimony call into question the veracity of Cartwright's assertions relative to both liability and damages, we find the trial court to have erred in dismissing the section 2—1401 petition without a hearing. Accordingly, we reverse the dismissal of defendant's section 2—1401 petition to vacate and remand the cause to the trial court with directions to conduct an evidentiary hearing on the authenticity of the evidence of Cartwright's military record presented at trial. In the event that the trial court determines that evidence to be false, the court is directed to order a new trial.

■ Defendant also claims that the trial court erred in excluding expert opinion testimony as to the causation of the accident. Because this issue may recur if a new trial is required, we dispose of it here.

Defendant challenges the trial court's exclusion of opinion testimony by State Trooper Edward Buescher that Gary Cartwright was most likely asleep at the wheel at the time of the accident. We hold that the trial court properly excluded this evidence. As a post-occurrence witness, Buescher was competent to testify as to the evidence found at the scene and to factual information derived from his examination. However, Buescher could not render his opinion as to matters unrelated to his investigation without either plaintiffs or defendant disclosing him as an expert witness under Supreme Court Rule 220 (134 Ill. 2d R. 220). See *Wakeford v. Rodehouse Restaurants of Missouri, Inc.*, 154 Ill. 2d 543, 549, 610 N.E.2d 77 (1992). Because Buescher's opinion testimony was beyond the scope of his investigation, he was a "retained expert" under Rule 220. *Wakeford*, 154 Ill. 2d at 549. Since he was not disclosed as an expert witness, the exclusion of Buescher's opinion as to causation was proper, and defendant is not entitled to a new trial on this basis.

886

In light of our disposition, we need not address the remaining issues raised by defendant and by plaintiffs in their cross-appeal.

Reversed and remanded.

EGAN and McNAMARA, JJ., concur.